# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# 3:05CV316-C

| | |
|---|---|
| ROBERT LOWINGER, Individually and On Behalf of All Others Similarly Situated, )<br>)<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>)<br>EUGENE B. JOHNSTON, DANIEL G. BERGSTEIN, KELSO INVESTMENT ASSOCIATES V, L.P., KELSO EQUITY PARTNERS V., L.P., FRANK K. BYNUM, GEORGE E. MAELICH, KELSO & COMPANY and FAIRPOINT COMMUNICATIONS, INC., )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>Defendants. ) | **MEMORANDUM AND RECOMMENDATION AND ORDER** |

**THIS MATTER** is before the Court on the "Defendants' Motion to Dismiss" (document #17) and "Brief in Support ..." (document #18), both filed November 14, 2005; and the "Plaintiff's Amended Memorandum in Opposition ... " (document #35) filed January 18, 2006. On January 31, 2006, the Defendants filed their "Reply ..." (document #38).

As discussed below, this matter has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), and the Defendants' Motion is now ripe for the Court's consideration.

Having fully considered the arguments, the record, and the applicable authority, the undersigned will respectfully recommend that the Defendants' "Motion to Dismiss" be <u>granted</u>, as discussed below.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This is a securities class action brought by Plaintiff Robert Lowinger, in his own behalf and on behalf of all other potential Plaintiffs who purchased stock in Defendant FairPoint Communications, Inc. ("FairPoint"), a North Carolina corporation headquartered in Charlotte, through its initial public offering ("IPO") on February 3, 2005, and alleging claims under the Securities Act of 1933, 15 U.S.C. § 77 et. seq., ("the 1933 Act"). At the time of the IPO, Defendant Eugene B. Johnson was Chairman of FairPoint's Board of Directors and its Chief Executive Officer, Defendants Daniel G. Bergstein, Frank K. Bynum, and George E. Maelich were members of FairPoint's Board of Directors, and Defendants Kelso Investment Associates V, L.P., Kelso Equity Partners V., L.P., and Kelso & Company were "investment funds" that sold FairPoint shares.

FairPoint is a provider of communications services incorporated in 1991 for the purpose of acquiring and operating telephone companies in rural markets. After several years of growth, on February 3, 2005, FairPoint issued its IPO, selling 25,000,000 shares of common stock to public investors at a price of $18.50 per share. At the time of the IPO, FairPoint owned and operated 26 rural telephone companies in 17 states.

Pursuant to the requirements of the 1933 Act, prior to conducting the IPO, FairPoint filed a prospectus with the Securities and Exchange Commission ("SEC") as part of a Form S-1 registration statement. FairPoint's prospectus included descriptions and disclosures regarding its business, detailed its financial performance for 2003 and the first three quarters of 2004, and "pre-released" key financial results for the final quarter of 2004 – the accuracy of which Plaintiff does not challenge. Relevant to the subject Motion to Dismiss, the prospectus also included disclosures regarding FairPoint's access line counts and digital subscriber line ("DSL") business.

Concerning access lines, the prospectus included third quarter 2004 data describing a 420%

acceleration in the rate of access line loss in the 12 months preceding September 30, 2004 (the rate of loss increased from 0.5% to 2.6% during that period), as well as warning that FairPoint "m[ight] continue to experience net access line loss in [its] markets," and that its "inability to retain access lines could adversely affect [its] business and results of operations." FairPoint further disclosed that "rural telephone companies ha[d] experienced a loss of access lines due to challenging economic conditions, increased competition and the introduction of digital subscriber line services," and that it "[had] not been immune to these conditions."

Regarding FairPoint's DSL business, the prospectus accurately stated that its data and internet services accounted for 7% of its 2004 revenues, and that its DSL customer base had increased 148% in the first three quarters of 2004 compared to the same nine-month period in 2003, an increase that FairPoint attributed to "aggressive" marketing of its DSL services.

Following the IPO on February 3, 2005, FairPoint's share price decreased from the offering price of $18.50 to $15.80 on March 22, 2005.

After the stock markets closed on March 22, 2005, FairPoint issued an "earnings release" of its financial and operating results for both fourth quarter 2004 and fiscal 2004. There is no dispute that FairPoint's annual 2004 earnings increased by 2% from the previous year, which was consistent with the earnings forecast in the earlier prospectus.

With respect to fourth quarter 2004 operations, the release reported that FairPoint's DSL subscriber base grew by 1,456 subscribers as compared to growth by 2,069 subscribers the previous quarter – a net difference of 613 subscribers out of a total of 31,876. The release attributed this "moderation" in DSL subscriber growth to FairPoint's efforts to achieve "<u>controlled</u> DSL growth striving for greater profitability and reduced churn [of customers who cancelled the service once introductory offers expired]" (emphasis added). The release further stated that FairPoint's date and

internet services revenues grew by nearly 9% from third to fourth quarter 2004, an increase attributed to the more "controlled" approach in its DSL business.

Concerning access lines, the release stated that FairPoint's rate of loss was 2.9% during 2004, 0.3% higher than the 2.6% rate disclosed in the prospectus for the period from September 30, 2003 through September 30, 2004. That decrease was partially attributed, however, to the favorable trend of residential customers replacing their second telephone phone lines (that had been used for Internet "dial up" service) with DSL lines. As a result, Fairpoint contended that "those [voice access line] losses of 2.9% were more than offset by new DSL accounts[,] causing access line equivalents to grow by about 2.6% for the year."

During the following week, FairPoint's stock traded in roughly the same range as immediately prior to the issuance of the earnings release, and closed higher at $16.05 on March 31, 2005.

On June 6, 2005, the Plaintiff filed his class action Complaint in the Superior Court of Mecklenburg County, North Carolina, alleging claims under Section 11(a), 12(a)(2), and 15 of the 1933 Act and contending that his, and the other participants in the IPO, losses in FairPoint stock (the decrease in share value below the $18.50 offering price) was the result of allegedly misleading statements in FairPoint's prospectus.

On July 11, 2005, the Defendants removed the state court action to federal court, alleging federal question jurisdiction.

This case was initially assigned to the undersigned, however, the parties did not indicate whether they consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c).

On August 10, 2005, the Plaintiff filed his Motion to Remand (document #2), which presented a single issue: whether securities class actions brought entirely under the 1933 Act are

removable to federal court.

On October 13, 2005, the undersigned <u>denied</u> the Plaintiff's Motion to Remand. <u>See</u> "Memorandum and Order" at 7 (document #11) ("there is no question that permitting timely removal of class actions consisting of 1933 Act claims is consistent with Congress' express intention 'to make Federal court the exclusive venue for securities fraud class action litigation'").

On October 28, 2005, the Plaintiff filed a "Refusal To Proceed Before a U.S. Magistrate Judge" (document #15), and this case was reassigned to the Honorable Robert J. Conrad, Jr., and referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B).

The same day, the Plaintiff filed an "Objection ... " (document #13) which seeks "clear error" review by the District Court of the undersigned's denial of the Motion to Remand. The Plaintiff's appeal is presently pending before Judge Conrad.

On November 14, 2005, the Defendants filed their "Motion to Dismiss" (document #17) and "Memorandum in Support" (document #18), which were referred to the undersigned for preparation of the subject Memorandum and Recommendation and Order.

On December 15, 2005, the Court signed the parties' <u>consent</u> "Preliminary Scheduling Order Relating to Defendants' Motion to Dismiss" (document #25) which set the due date for Plaintiff's response brief to January 6, 2006, and the Defendants' reply brief to January 24, 2006.

On December 22, 2005, however, the Plaintiff filed an "Emergency Motion to Stay Briefing ... of Defendant's Motion to Dismiss until the Court Rules on Plaintiff's Motion to Remand," contending that those briefs were unnecessary until Judge Conrad rules upon the Plaintiff's Motion to Remand. The Plaintiff conceded, however, that whether to issue such a stay was within the Court's discretion.

On December 27, 2005, the undersigned <u>denied</u> the Plaintiff's "Emergency Motion to Stay

Briefing," but extended the parties' deadlines for filing their respective response and reply briefs by one week, roughly the same number of days that the Emergency Motion to Stay Briefing was pending.

The parties timely filed those briefs, which have refined the Defendants' Motion to Dismiss to the question of whether either the DSL or access line disclosures in the prospectus, discussed above, which were incorporated in FairPoint's registration statement, were materially false or misleading because it did not also disclose that in fourth quarter 2004, it shifted its DSL marketing policy from "aggressive" to "controlled," and the rate of loss of access lines had increased from 2.6% to 2.9 %.

The Defendants' Motion to Dismiss has been fully briefed as set forth above and is, therefore, ripe for disposition.

## II. DISCUSSION

### A. Standard of Review

"A motion to dismiss under [Fed. R. Civ. P. 12(b)(6)] tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party of North Carolina v. Martin, 980 F.2d 943, 952 (4th Cir.), cert. denied, 510 U.S. 828 (1993), citing 5A C. Wright & A. Miller, Fed. Practice and Procedure §1356 (1990).

"A motion to dismiss for failure to state a claim should not be granted unless it appears to a certainty that the plaintiff would be entitled to no relief under any state of facts which could be proved in support of [the subject] claim." McNair v. Lend Lease Trucks, Inc., 95 F.3d 325, 328 (4th Cir. 1996)(en banc), citing Rogers v. Jefferson-Pilot Life Ins. Co., 883 F.2d 324, 325 (4th Cir. 1989);

and Johnson v. Mueller, 415 F.2d 354, 355 (4th Cir. 1969). Accord Republican Party of NC, 980 F.2d at 952 ("A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief") (internal citation omitted).

In considering a Rule 12(b)(6) motion, the complaint must be construed in the light most favorable to the nonmoving party, assuming factual allegations to be true. See, e.g., Hishon v. King & Spaulding, 467 U.S. 69, 73 (1984); Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993); Martin Marietta v. Int'l Tel. Satellite, 991 F.2d 94, 97 (4th Cir. 1992); and Revene v. Charles County Comm'rs, 882 F.2d 870, 872 (4th Cir. 1989).

"Rule 12(b)(6), however, is not without meaning." Migdal v. Rowe Price-Fleming Int'l, Inc., 248 F.3d 321, 326 (4th Cir. 2001). A court is "not required … 'to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences.' Nor must [the court] 'accept as true allegations that contradict matters properly subject to judicial notice or by exhibit.'" Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002), quoting Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001).

It is well settled that concerning claims brought under the 1933 Act, "a court ruling on a 12(b)(6) motion may look to documents or articles cited in the complaint, SEC filings, press releases, stock price tables, and other material on which the plaintiff's allegations necessarily rely." Greenhouse v. MCG Capital Corp., 392 F.3d 650, 656-57 (4th Cir. 2004). Accord R2 Invs. LDC v. Phillips, 401 F.3d 638, 640 n. 2 (5th Cir. 2005) ("a court may ... take judicial notice of documents in the public record, including documents filed with the Securities and Exchange Commission ... and may consider such documents in determining a motion to dismiss"); and SunTrust Bank v. Aetna Life Ins. Co., 251 F. Supp. 2d 1282, 1287 (E.D. Va. 2003) ("when a plaintiff fails to introduce a pertinent document as part of his complaint [or the document is a matter of public record whose

7

authenticity is unquestioned], the defendant may attach the document to a motion to dismiss the complaint and the Court may consider the same without converting the motion to one for summary judgment").

**B. Section 11(a) and 12(a)(2) Claims**

Section 11(a) of the 1933 Act imposes liability on defendants if a registration statement, "at the time it became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). Accord Oxford Asset Mgmt. Ltd. v. Jaharis, 297 F.3d 1182, 1190 (11th Cir. 2002), cert. denied, 540 U.S. 872 (2003); Hillson Partners LP v. Adage Inc., 42 F.3d 204, 219 (4th Cir. 1994); and Recupito v. Prudential Sec., Inc., 112 F. Supp. 2d 449, 453 (D. Md. 2000). Similarly, Section 12(a)(2) of the 1933 Act imposes liability upon any person "who offered or sold [a] security by means of a prospectus ... which includes an untrue statement of material fact or a material omission." 15 U.S.C. § 77l(a)(2). Accord Steckman v. Hart Brewing, Inc., 143 F.3d 1293, 1296 (9th Cir. 1998); and In re Royal Ahold N.V. Sec. & ERISA Litig., 351 F. Supp. 2d 334, 401 (D. Md. 2004).

Neither Section 11(a) nor Section 12(a)(2) require issuers to include all available information concerning a company. See Oxford Asset Mgmt. Ltd., 297 F.3d at 1190 ("Section 11(a) only makes actionable the omission of a material fact required to be stated in the prospectus or necessary to make the statements in the prospectus not misleading"); and Steckman, 143 F.3d at 1296 (same as to Section 12(a)(2) claim). Instead, "the relevant SEC regulations answer the question as to what material facts are required to be stated in an issuer's registration statement and prospectus." In re N2K, Inc. Sec. Litig., 82 F. Supp. 2d 204, 207 (S.D.N.Y.), aff'd, 202 F.3d 81 (2d Cir. 2000). Accord DeMaria v. Andersen, 153 F. Supp. 2d 300, 311 (S.D.N.Y. 2001), aff'd, 318 F.3d 170 (2d Cir. 2003)

Because the IPO was to take place on February 3, 2005, within 90 days of the close of FairPoint's fiscal year on December 31, 2004, SEC regulations required FairPoint to include in the prospectus, which in turn was to be included in the registration statement, financial information through the end of third quarter 2004. See 17 C.F.R. § 210.3-12(b) (where the issuer files its registration statement/prospectus within 90 days "subsequent to the end of the fiscal year ... the filing need not include financial statements more current than as of the end of the third fiscal quarter of the most recently completed fiscal year"). It is undisputed that Fairpoint complied with this requirement.

The essential allegation of the Plaintiffs' claims is that FairPoint failed to perform its additional duty to disclose "such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 230.408.

Under the federal securities laws, "a fact is material if there is a substantial likelihood that the disclosure of the ... fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." Greenhouse, 392 F.3d at 656, citing Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1988). Accord Phillips v. LCI Int'l, Inc.,190 F.3d 609, 617 (4th Cir.1999) (noting "even lies are not actionable" unless lie is something altering total mix of information available to reasonable investor); Gasner v. Bd. of Supervisors, 103 F.3d 351, 356 (4th Cir.1996) (explaining that the question of materiality is an objective one); and DeMaria, 318 F.3d at 180 (in considering an issuer's compliance with Rule 408, courts consider the offering document at issue "as a whole ... not focus[ing] on whether particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have mis[led] a reasonable investor about the nature of the [securities]").

In assessing materiality, "[i]t is important to note that a reasonable investor is neither an

9

ostrich, hiding h[is] head in the sand from relevant information, nor a child, unable to understand the facts and risks of investing." Greenhouse, 392 F.3d at 656. Rather, the materiality of the alleged nondisclosures must be considered in the full context of truthful disclosures that were made, because they may present or conceal insignificant data that, in the total mix of information, simply would not concern a reasonable investor. Accord Greenhouse, 392 F.3d at 656; Phillips, 190 F.3d at 617; and Gasner, 103 F.3d at 358.

As the Defendants note in their briefs, the Fourth Circuit has repeatedly affirmed dismissals for lack of materiality at the Rule 12(b)(6) stage. See, e.g., Greenhouse, 392 F.3d at 657-58 (claim that company's CEO lied about his educational background immaterial); Hillson Partners, 42 F.3d at 219 (claim premised on optimistic income projections immaterial); and Raab v. General Physics Corp., 4 F.3d 280, 290-91 (4th Cir. 1993) (claim based on predictions about future growth immaterial).

Moreover, concerning both FairPoint's undisclosed decision to shift from "aggressive" to "controlled" marketing of its DSL business and the nondisclosure of the 0.3 % increase in its rate of line loss in fourth quarter 2004, it is well settled that such nondisclosures will be "material" only where there is a meaningful departure from anticipated overall results. See, e.g., Romine v. Acxiom Corp., 296 F.3d 701, 707-08 (8th Cir. 2002) (failure to disclose loss of customers resulting in 5% decrease in revenues immaterial); Glassman v. Computervision Corp., 90 F.3d 617, 631 (1st Cir. 1996) (where "undisclosed [intra-quarterly] hard information … did not indicate a substantial likelihood that the quarter would turn out to be an extreme departure from publicly known trends and uncertainties," disclosure was not required); Hillson Partners, 42 F.3d at 219 (in deciding whether an event is material, the magnitude of the event is measured in light of the totality of the company's activity); Smith v. Circuit City Stores, Inc., 286 F. Supp. 2d 707, 720-21 (E.D. Va. 2003) (nondisclosure of 3.25% decrease in earnings immaterial); and In re First Union Sec. Litig., 128 F.

Supp. 2d 871, 895 (W.D.N.C. 2001) (alleged nondisclosure of 2.1% decrease in company's operating earnings immaterial).

Notwithstanding the Plaintiff's contention that Fairpoint should have disclosed that it was adopting a "controlled" DSL marketing strategy, rather than using the adjective "aggressive" to describe its DSL efforts, the Fourth Circuit Court of Appeals has held that loosely defined, optimistic, "puffing" statements are not material to a reasonable investor's decision process. See, e.g., Hillson Partners, 42 F.3d at 211 ("soft, puffing statements ... generally lack materiality because the market price of a share is not inflated by vague statements predicting growth ... no reasonable investor would rely on these statements"); and Raab, 4 F.3d at 289 ("puffing statements" were immaterial).

Although the Fourth Circuit has not considered the specific words at issue in this case, the Seventh Circuit has held that in the context of an investor's decision to buy stock, both "controlled" and "aggressive" are immaterial "puffing" terms. Vaughn v. General Foods Corp., 797 F.2d 1403, 1411-12 (7th Cir. 1986). Accord City of Monroe Employees Retirement System v. Bridgestone Corp., 399 F.3d 651, 670-71 (6th Cir.) (same as to "aggressive"), cert. denied, 126 S. Ct. 423 (2005); and Lain v. Evans, 123 F. Supp. 2d 344, 348 (N.D. Tex. 2000) (same).

Applying these legal principles to the allegations of the Complaint, which are taken as true at this point in the proceedings, the Plaintiff has failed to state an actionable claim for misrepresentation of a material fact as to either the prospectus (Section 12(a)(2) claim) or the registration statement that incorporated the prospectus (Section 11(a) claim). At the outset, the undersigned notes that notwithstanding the nondisclosures discussed above, FairPoint's overall 2004 earnings increased 2% as they had been forecast to do. In other words, there was not a departure from the anticipated overall results stated in the prospectus, much less a meaningful departure that was in any way related to the subject nondisclosures. Accord Romine, 296 F.3d at 707-08;

Glassman, 90 F.3d at 631; Hillson Partners, 42 F.3d at 219; Circuit City Stores, Inc., 286 F. Supp. 2d at 720-21; and In re First Union Sec. Litig., 128 F. Supp. 2d at 895. Additionally, as the Defendants point out in their briefs, the stock market's benign reaction to the March 22, 2005 earnings release, which revealed the previously undisclosed facts at issue in this case, belies the Plaintiff's contention of materiality.

Moreover, the undisclosed 0.3 % fourth quarter increase in FairPoint's rate of access line loss was immaterial in light of the accurate disclosure that the rate of loss had increased from 0.5 % to 2.6 % in the preceding 12 months, and the clear warnings that FairPoint's "inability to retain access lines could adversely affect [its] business and results of operations," that "rural telephone companies [such as FairPoint] ha[d] experienced a loss of access lines due to challenging economic conditions, increased competition and the introduction of digital subscriber line services," that FairPoint "[had] not been immune to th[o]se conditions," and that the rate of loss could continue to increase in the future.

Similarly, FairPoint's data and internet services business, which included DSL services, accounted for only 7% of FairPoint's 2004 revenues and it is undisputed that fourth quarter 2004 data and internet services revenue increased by 9% from the previous quarter. In that light, FairPoint's use of "aggressive" rather than "controlled" in the prospectus to describe its DSL marketing efforts was clearly not material. Accord Bridgestone Corp., 399 F.3d at 670-71; Hillson Partners, 42 F.3d at 211; Raab, 4 F.3d at 289; Vaughn, 797 F.2d at 1411-12; and Lain, 123 F. Supp. 2d at 348.

In short, the Plaintiff has failed to allege material nondisclosures that would "have been viewed by the reasonable investor as having significantly altered the total mix of information made available." Greenhouse, 392 F.3d at 656. Accord Basic, Inc., 485 U.S. at 231-32; Phillips,190 F.3d at 617; Gasner, 103 F.3d at 356; and DeMaria, 318 F.3d at 180. Accordingly, the undersigned will

12

respectfully recommend that the Defendants' Motion to Dismiss be <u>granted</u> as to the Plaintiff's Section 11(a) and Section 12(a)(2) claims.

### C. Section 15 Claim

The Plaintiff also seeks to hold Defendants Johnson, Bynum, Matelich, and Kelso liable as "control persons" under Section 15 of the 1993 Act. Under Section 15, control persons are jointly and severally liable with persons or entities found primarily liable under Sections 11(a) and 12(a)(2). <u>See</u> 15 U.S.C. § 77o. In light of the Plaintiff's failure to allege a primary violation of either Section 11(a) or 12(a)(2), discussed above, his Section 15 claim fails as well. <u>Accord</u> <u>Kapps v. Torch Offshore, Inc.</u>, 379 F.3d 207, 221 (5th Cir. 2004) (violation of Section 15 of the 1933 Act contingent upon violation of Section 11 or 12); <u>and</u> <u>Klein v. General Nutrition Companies, Inc.</u>, 186 F.3d 338, 344 (3d Cir. 1999) (same). The undersigned will recommend, therefore, that the Defendants' Motion to Dismiss the Plaintiff's Section 15 claim also be <u>granted</u>.

### III. RECOMMENDATION

**FOR THE FOREGOING REASONS,** the undersigned respectfully recommends that the "Defendants' Motion to Dismiss" (document #17) be **GRANTED**; and that the Complaint be **DISMISSED WITH PREJUDICE**.

### IV. ORDER

**IT IS ORDERED** that all further proceedings in this action, including <u>all</u> discovery, are **STAYED** pending the District Court's ruling on this Memorandum and Recommendation and Order.

## V. NOTICE OF APPEAL RIGHTS

The parties are hereby advised that, pursuant to 28 U.S.C. §636(b)(1)(c), written objections to the proposed findings of fact and conclusions of law and the recommendation contained in this Memorandum must be filed within ten (10) days after service of same. Page v. Lee, 337 F.3d 411, 416 n.3 (4th Cir. 2003); Snyder v. Ridenour, 889 F.2d 1363, 1365 (4th Cir. 1989); United States v. Rice, 741 F. Supp. 101, 102 (W.D.N.C. 1990). Failure to file objections to this Memorandum with the district court constitutes a waiver of the right to de novo review by the district court. Diamond v. Colonial Life, 416 F.3d 310, 315-16 (4th Cir. 2005); Wells v. Shriners Hosp., 109 F.3d 198, 201 (4th Cir. 1997); Snyder, 889 F.2d at 1365. Moreover, failure to file timely objections will also preclude the parties from raising such objections on appeal. Diamond, 416 F.3d at 316; Wells, 109 F.3d at 201; Page, 337 F.3d at 416 n.3; Thomas v. Arn, 474 U.S. 140, 147 (1985); Wright v. Collins, 766 F.2d 841, 845-46 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

The Clerk is directed to send copies of this Memorandum and Recommendation and Order to counsel for the parties; and to the Honorable Robert J. Conrad, Jr.

**SO RECOMMENDED AND ORDERED**.

Signed: February 9, 2006

_Carl Horn, III_

Carl Horn, III
United States Magistrate Judge